And we will hear argument in Ford v. New Singular Wireless. Counsel, you may proceed. Good morning, and may it please the Court. My name is Seamus Duffy, and I represent AT&T Mobility, the appellant here. We seek reversal of an injunction issued by the District Court prohibiting AT&T Mobility from consummating a part of an otherwise comprehensive nationwide settlement preliminarily approved by the Superior Court in Fulton County, Georgia. In particular, that aspect of the settlement that would resolve the claims of AT&T Mobility customers in the MDL titled In Re Jamster Marketing MDL. We contend that that injunction violated the Anti-Injunction Act and was thus issued without authority under the All Writs Act. I'd like to begin, if I might, by taking just a few moments to emphasize a few aspects of the scenario that AT&T Mobility faced in May of 2008 with respect to what we call the mobile content litigation. AT&T is, of course, a cell phone carrier. AT&T opened up its network to sellers of so-called digital or mobile content. These are ringtones, news alerts, restaurant location guides, and a myriad of other digital content. In May of 2008, now let me add, AT&T Mobility provides a network for the sale of these products but is not the ultimate seller. In May of 2008, AT&T Mobility faced 18 pending purported class action lawsuits pending across the country from Georgia to New York to Illinois to Minnesota to California with respect to these services. Only three of those cases were pending in the MDL, in the In Re Jamster MDL below, and those cases involved only the sale of Jamster products and advertising concerning the sale of Jamster products, which was only one of the mobile content providers in the marketplace. So as to AT&T, the MDL represented only a small portion of the pending cases against us and only a small portion of the pending liability at issue. We also had pending in the Northern District of California, principally in the Northern District, a cluster of cases that alleged that some customers were being charged for mobile content because they had inherited a mobile telephone number from a prior owner and they were being improperly charged for the content. And then we had a third group of cases, which we've come to call the McFerrin cases, that were pending all over the country. Those cases were primarily brought against AT&T Mobility, and they broadly alleged that AT&T Mobility lacked the internal controls necessary to assure that customers were in fact consenting to these charges for mobile content. We wanted to settle the litigation globally in one class action settlement. We wanted global peace, and our approach was that we would then seek from the underlying content providers under our indemnity rights, under our contracts, we would seek reimbursement from them for the cost of that settlement. We thought that was a good and appropriate litigation strategy, and it was also consistent with the company's overall business philosophy with respect to these products because to put it simply, as a cell phone carrier, we don't want to lose a customer over a disputed ringtone transaction. So we had always provided liberal refunds in this area in the day-to-day course of business with our customers, and so this settlement for us made sense. Well, one way to read what the court did here, it seems to me, is that it tried to fashion something extremely precise compared to the Georgia litigation, which was primarily about things other than deceptive advertising. And if the two suits are relatively distinct in that way, what effect does that have on our analysis, number one? And I guess my second question is whether the district court was motivated and perhaps permissibly motivated by what appeared to be obstructionist tactics by your client. Well, let me address the second point first because I think this idea of obstructionist or underhanded tactics is something that's been created by some very harsh and I think more importantly some misleading advocacy on the part of the plaintiffs. Well, I'm not interested in the opponent's advocacy. I'm interested in what the district court was thinking because our review is of the district court, not of your opponents. And so if that factored into the court's thinking, was that a permissible factor for it to consider? Under the Anti-Injunction Act, Your Honor, I think not, and here's why. Judge Bonner in the Fulton County Business Court, which is a court in Atlanta, is perfectly capable of dealing with the matters before her. And it seems to me antithetical to the Anti-Injunction Act that a federal court would look at a situation and say, I'm going to correct what I perceive to be a situation where AT&T was less than candid with Judge Bonner. Now, let me hasten to add that if you look at the record at page 43, that transcript before Judge Bonner, Judge Bonner was told about the MDL. It was in the preliminary approval papers. When she asked the question, what's the need for expedition, the plaintiffs have said that the answer to that question AT&T gave was, well, there are business reasons, period. Let me read you what Mr. Edelson actually said at that hearing. He's the plaintiff's counsel in McFerrin. And the argument is that instead of being candid with her and telling her that there were pressures going on in other courts, she was told that there were simply just these unstated business reasons for seeking approval. Quickly, here's what was actually said. There were some external reasons, business reasons, and here's what was left out by the plaintiffs. Litigation pressure in the various courts and other courts, which the understanding was that we had to finish it up by the end of the month. Judge Bonner, and this is in the record, was told about the MDL. She was told that the case, the McFerrin settlement, would affect the MDL in a sense that it would resolve a subset of the claims in the MDL. And she was told also quite accurately that the MDL involved a subset of the claims in the MDL. And so I don't think there should be created a new exception to the Anti-Injunction Act for, as Your Honor put it, obstructionist tactics. But let me say clearly what we did in this case was not underhanded in any way. Let me be direct. Well, is there, I guess I'm thinking about the issue of being in aid of the court's jurisdiction. It might be relevant to that analysis. Your Honor, the court probably thought so. And I think that's where, under the Anti-Injunction Act, the question of whether there is underhanded activity in another court, it would be dangerous precedent to create a situation where federal judges would be put in a position to do sort of a drive-by analysis of what was happening in another court and say I'm going to enjoin that settlement from going forward because I have reached a conclusion that there was a situation in that court that was, whether it be collusion or whatever the allegation was. Well, that would divest this court of jurisdiction if it goes through. And, Your Honor, that's true if you look at all of the cases in this area. And that's the whole idea of the Anti-Injunction Act is that parallel proceedings are allowed to proceed and the first case that gets to judgment, that judgment has effect. That's the whole idea. Now, when it comes to MDLs, there have been cases, for example, where you have an MDL global settlement, like in the Diodrugs case, in the Baldwin United case. And in those situations, the MDL court is thought to garner sort of an in-rem jurisdiction over the case that allows it to then protect that settlement from renegade attacks in other courts. Here, Your Honor, we have really almost the opposite of that. We have a situation where Georgia was really the appropriate, or the McFarland group of cases, was the appropriate vehicle for us to do the settlement that we envisioned comprehensively. If we had taken our settlement to Judge Miller, we know from his rulings in the case that he would have viewed it as an inappropriate expansion, exponential expansion, of the issues before him. And so, let me be direct. We, in the Georgia court, sought expedited preliminary approval of our settlement for the very purpose so that we could appear before Judge Miller with a settlement in place and advise him that as to the next phase of the MDL litigation, we should not be included. The plaintiffs have made that appear to be some kind of improper motive, as if sort of as if we were operating in an MDL jurisdictional no-fly zone. But that is not the law. The law is not that MDL courts take on some superpower. That argument has been rejected time and again. Counsel, you're primarily relying on Negret, I take it, a Negret case? Yes. Just take us through that case. Why should Negret compel a reversal here? Negret, I was calling it until now Negrete, but I'll call it Negret. I don't have an idea. Your Honor, it confirms decades of Supreme Court and Ninth Circuit jurisprudence that the exceptions to the Anti-Injunction Act are to be construed narrowly. The Anti-Injunction Act does not have an exception. It does not create a sort of no-fly zone exception for MDL jurisdiction. Nor is there a general exception for collusive settlements. Let me be clear. You would defend this even if it were? Pardon me, Your Honor? Even if this were a collusive settlement, you would say there was nothing to be done? Your Honor, I would say this. Respectfully, if it were a collusive settlement, that is an issue for Judge Bonner and the appellate courts of Georgia to address. And I think that's what the Anti-Injunction Act requires. Do we know the total amount of the settlement proposed in Georgia in money terms? Yes, Your Honor. What it is is cash refunds. I know, but how much money? How much money was at issue? How much money is in the settlement? Your Honor, there is no cap on the settlement. There is no fund or limited cap created. What's the best guess? Your Honor, there were well over $500 million in charges in this area generally. Many of them were refunded over time. Just as I said in the back and forth with our customers, it's very difficult to put a particular dollar value on the Georgia settlement. Well, how do you put a value on council services? How did you reach that? Your Honor, I don't know that I've ever settled a class action case where I thought that the plaintiff's attorney's fee was what I would have set it at. No, but your client settled it. Yes, sir. Max, what, $4.3 million? Yes, sir. How did your client reach that amount? That was a subject of back and forth in the mediation process. Five days of mediation, is that what they spent their time on? A lot of it, sir, yes. I mean, obviously— No, you've got to say that, and I'm sure you're being candid with us, that it's pretty surprising that this convenient group of plaintiffs came along and that they were so amenable to settlement and it all went so smoothly and you wrapped it up just in time to let Judge Miller know we've got it all settled. On the face of it, he didn't want to go into it, but I wonder why it should not be gone into. Well, it's been made to appear that way, Your Honor. It's been made to appear collusive in that sense, Your Honor. But I would offer this. These were sophisticated lawyers on the other side. They had been involved in this litigation for at least a couple of years, certainly as long as the plaintiffs in this case had. There were many of them— You're speaking of the plaintiff's lawyers in Georgia? Pardon me, sir? You're speaking of the plaintiff's lawyers in Georgia? Yes, sir, the plaintiff's lawyers in the McFerrin cases. They were prosecuting the recycled number actions in California. The settlement is a cash refund settlement, so we're not talking about coupons or free minutes or something like that. It was presided over by a mediator, Rodney Max, from Florida, who's a nationally recognized mediator. So the notion that this was some backroom, cloak-and-dagger, last-minute settlement— We don't know what percentage of the settlement is going to the plaintiff's lawyers. Your Honor, it's impossible for me to give you that formula just because of the nature of the settlement. That's rather important if you're thinking collusion. Well, and I appreciate that, Your Honor. No, the class is nothing. It's the lawyers who are making money. And so it's where the lawyers are making money that we want to look. And I would offer this, Your Honor. $4.3 million for a case of this size and significance does not strike me as being out of the ordinary. And again, I'm not—hard for me to stand up— Well, I mean, if there were $500 million floating around, that seems very small. Yes, sir. Now, we would say it's not a $500 million case because the majority of— we hope the vast majority of those transactions were perfectly legitimate. And as I've said, there were a lot of refunds awarded in this space just outside the context of litigation completely. So the question of collusion—it's hard for me to stand here before you, Your Honor, and say that the idea of collusion should ever be ignored. But under the Anti-Injunction Act, respectfully, sir, I think that that's an issue for Judge Bonner. She's a very astute judge in the business court in Atlanta. And I assure you that she can take care of matters before her. She took care of this on the telephone, didn't she? Well, she did. The preliminary— That was a great hearing. It was on the telephone. It was a telephone hearing, yes, Your Honor. But I'll say this— She really threw herself into it. Well, I've had many preliminary approval hearings in my career. And, you know, the preliminary approval—the idea of preliminary approval of a settlement doesn't require live testimony. And, you know, I think she was well prepared. She obviously reviewed the papers. And she asked the important questions. One of which was, what about this MDL? And she was told, this will affect the MDL. The MDL is a subset of this. And she told us, tell—I want you to tell those lawyers right away, which, of course, we had intended to do. I think—and I want to draw this to the Court's attention—that the district court's legal analysis was infected by this, what I would call liberal use of quotations. If you look at page 13 of the appellate record, there's a quote from the Grider case. And the quote jumped out at me in preparation for argument because it ends with the following sentence. This is a quote from a Third Circuit case. And this actually appears in Judge Miller's opinion. Accordingly, in cases such as this—this is referring to complex class actions— a federal court has the discretion to enjoin parallel state actions which, due to the risk of inconsistent decisions, may undermine or eliminate the court's authority over the action. That is a remarkably broad statement of federal judicial power, seemingly, at least to me, at odds with all of the jurisprudence under the Anti-Injunction Act. And so in preparation for argument, I went back to the Grider case. It's a case from my circuit. And I looked at the decision. Now, set aside that the Grider case didn't involve the Anti-Injunction Act because it was a federal-to-federal court injunction issue, the amazing fact is that that sentence doesn't appear in the Grider decision. Not in the footnote that was being quoted. Not anywhere in the decision. Indeed, that sentence appears nowhere in any reported decision until it appeared in Judge Miller's. And so I thought, where did this come from? And where it comes from, if you look at page 484 of the appellate record, is the plaintiff's opening brief before Judge Miller. And to add insult to injury, the sentence—this sentence that I believe inspired Judge Miller to the view that there was this sort of general exception to the Anti-Injunction Act for MDL proceedings, the quote actually replaces limiting language from Judge Fisher's opinion in that case. What you have here is—it doesn't help me to say this, but the district court judge in this case is a thoughtful, reasonable, excellent trial judge. And what happened here was that he was led astray and led to disregard the limitations of the Anti-Injunction Act by a fundamental mischaracterization of what happened before Judge Bonner combined with some, with all due respect, irresponsible advocacy on the law. From a policy standpoint, it would be dangerous for this court to create a new exception to the Anti-Injunction Act for circumstances in which an MDL judge is dissatisfied with a settlement from a state court. Counsel, I'm going to ask opposing counsel the same question you do with Negret. But I gather there is no evidence of collusion in this record with respect to the McFerrin settlement? Yes, Your Honor. And what about reverse auction? No, the Edelson attorneys required of us as a condition of negotiating that we assure them we were not negotiating with anyone else because they wanted to avoid any appearance of reverse auction. So we were not— There was no MDL class established in this case? No, sir. No discovery at this stage? No, sir. And no settlement within the MDL structure underway? That's correct, sir. I'm going to ask the same question of your opposing counsel. And may I reserve the balance of my time? You have exceeded your time by six minutes, and the questions from the court allowed you to go over your time. Thank you, counsel. I'll try to speak very quickly to make up that six minutes within my 15-minute time frame. We'll allow you to go over time, if necessary, counsel. But first of all, would you please introduce yourself for the record? And secondly, would you please speak louder?  I will speak louder. Thank you. I will speak louder. I apologize for my initial remarks. Frank Gregoric for the appellees in this matter. We believe that the limited injunction granted here by Judge Miller was justified under the Anti-Injunction Act. And what I'd like to do very quickly is provide the standard of review, which is here an abuse of discretion standard. We feel that the appellants have not established or carried their burden, have established that the judge committed an error of law, nor that he arrived at a clearly erroneous legal factual findings, nor that the injunction in this case, which Judge Graber has already noted, Judge Miller attempted to define with clear precision was in any way overbroad. In fact, it was clearly restricted to the claims that he had been entrusted by the MDL panel to deal with. And as Judge Miller noted, it was not so much an effort to thwart the dealings of the Georgia courts so much as it was to avoid the threats to his jurisdiction. And the Supreme Court in Atlantic Coast and also the Ninth Circuit in Hanlon has indicated that where threats to a federal court's jurisdiction are perceived, that court may act to avoid them. What I'd like to do is to do is to do this. Scalia, within limits, obviously. What about McGrath? Let's talk about McGrath. Your Honor, McGrath. Two basic points. Number one, McGrath is not an MDL action. That's number one. At the point in its decision where it talks about the importance of MDL proceedings in the context of injunction, Anti-Injunction Act cases, the Court in footnotes 16 of its opinion specifically notes that the case before it was not an MDL case. Why should that be significant? Because, Your Honor, I think it goes to the question of whether or not, in part, whether you can have issue of the injunction where you don't have an in rem situation. And in those circumstances, it appears that the courts have indicated that where cases have been developed in the federal court system, it kind of equates to an in rem situation, which allows for the injunction to be granted. And if I might, it's very important to note something here. The Georgia action was filed on April Fool's Day, 2008. By that time, the federal cases had already been pending for three years. Judge Miller has ruled on, in the course of the matters before him, five motions to dismiss, seven motions to compel, multiple seven motions, formal motions or requests to stay. There have been seven appeals to this Court, and there has been one appeal to the Supreme Court of the United States. Okay. But no discovery, no class certification, no pending settlement within the MDL structure. No class certification, Your Honor, or discovery because the defendants insisted that the arbitration issues be dealt with first, and then when those arbitrations, when those issues were ruled against, then they insisted that the motion to dismiss be determined next. That takes me, I think, to judge back to Judge Draper's question about obstructionist tactics, which I don't think that Mr. Duffy fully answered. He went off and he started talking about what went on in the Georgia court and whether or not Judge Miller properly took a look at those proceedings. There's two points to be made here. The first is that Judge Miller based his ruling not simply on what happened in the Georgia court, but what happened in front of him for three years. And in particular, he notes that he was continually asked to stay proceedings in that case based upon the argument by defense counsel there, including AT&T, that if he did not stay the proceedings, they would quickly become uncoordinated and that would result in needless cost to AT&T, while Judge Miller found at the same time they were litigating the McFerrin action and negotiating with those parties and apparently providing those people with discovery. Well, let me ask you this. Is there a case that suggests that the factor, I always called it and agreed also, but that the factor relating to how far the federal litigation has evolved, that that factor can take into account how far it hasn't evolved by the acts of the party that's to be charged by the injunction? I'm not making that very clear, but it's a surrogate for development of the litigation in the normal course over three years is putting brakes on it. I believe I understand your question, Your Honor. The case law in this area is very sparse, as I'm sure you know. Secondly, I would disagree with the characterization of this case as not being completely developed. When you've had five motions to dismiss, seven motions to compel arbitration, multiple motions for a stay, we've been up before this panel seven times, and when we've been to the Supreme Court, I think the federal courts have in fact developed this case a very long way. And all of that activity in the federal court has to be weighed against a telephonic conference in Georgia. That is the sole interaction between Judge Bonner and these parties. I talked about the obstructionist tactics before Judge Miller. I'd like to go back to those before Judge, perceived to be before Judge Bonner, because I believe this was part of Your Honor's question, which I don't think was answered. The significance of the procedural and substantive deficiencies in Georgia have two weights in two different contexts. Mr. Duffy says, well, the Georgia court can deal with whether or not there's any perceived deficiency there. Well, that might be true with respect to whether or not the settlement is fair, reasonable, and adequate. However, Judge Miller is also looking at those factors for perceived threats to his jurisdiction and what was happening here. And he concluded that the parties were not well served. And this was not the result of what, excuse me, the courts, both the Georgia and the federal court, were not well served. And this was not, from his conclusion, was not the result of what Mr. Duffy terms a drive-by analysis. We gave Judge Miller, we, not AT&T, gave Judge Miller the transcript of the proceedings before Judge Bonner. But more importantly, the docket reflects that Judge Miller, exercising due diligence, called Judge Bonner and spoke to, apparently spoke to her about the proceedings that morning. Is that in the record? Yes, Your Honor, it's in the docket. The transcript of the phone conversation? The transcript of the phone conversation is not noted on the docket that he had, in fact, spoken to Judge Bonner. And it was only after that, after reviewing the Georgia transcript and speaking to Judge Bonner, that he wrote his opinion and concluded that neither party was well served. It's very important to look at what happened in that Georgia proceeding. These parties run into court on the morning of May the 30th, 2008. They file their preliminary approval papers that morning. Hours later, they go before Judge Bonner in a telephonic phone conference. It is obvious from a reading of that transcript that Judge Bonner was not very familiar with the proceedings before her. She asked some very basic questions. Judge Miller, looking at that transcript, comes to the reasonable conclusion, which was not a clearly erroneous finding of fact, that the judge had not fully understood what was going to happen in terms of the impact on the MDL proceedings. But interestingly, in terms of – I think Judge Miller, a fair reading of his opinion is that his language is somewhat diplomatic. I mean, he says that AT&T and the parties in Georgia were less than forthright with him in the court. And I think Mr. Duffy provided a perfect example of that when he was reading from the transcript before. When asked by Judge Bonner, basically, what's the rush? They say, well, there's general business matters, and we need to clear this up before the end of the month. What they don't tell Judge Bonner is the reason for the rush is that in moments they're going to be in front of Judge Miller in a status conference that had been previously scheduled, a status conference at which Judge Miller had told us that it was going to be full steam ahead in the MDL case. Yet, unaware to the plaintiffs and to the court, as Judge Miller notes, these parties run into the Georgia court in an attempt to get a preliminary approval based upon papers that were filed that morning. All right, counsel, let me tell you where I'm starting from. I look at the Anti-Injection Act as a very serious limitation on federal jurisdiction. And if we're going to make an exception, it's got to be based on some recognized exception rule. And I'm looking for, and I hope you can provide me, for some indication that there is one of the recognized exceptions or that there is evidence of a reverse auction, which is the other of the two major recognized exceptions. I can't find evidence of either. Can you? Your Honor, I think Judge Miller below, it is clear that he relies on the decisions in Winkler, where the opinion was written by Judge Coffey, and also the AOL and the Managed Cares decision. In both of those instances, there were issues of forum shopping and also reverse auction. He analogizes those decisions. He cites them. He analogizes them to the facts present in his case, and that's why he recites at great length the facts of Managed Care. I do think the evidence in this case of the reverse auction. I think in this instance, Your Honor, what he was looking at, he looked at the deficiencies in the procedure and also the terms of the Georgia settlement. As indicated earlier in response to the question by Judge Newman, Plaintiff's Counsel received approximately $4.3 million in fees with respect to a case which had been started less than two months prior to the preliminary approval. There is a question. He questions whether or not that settlement. I'm not quite sure what that means. Is that too high or too low? It sounds way too high to me for two months' work, Judge. I mean, that's my personal conclusion. Do you agree with AT&T's guesstimate, about $500 million? Not at all. Pardon? I think that number was pulled out of thin air, Your Honor. There's nothing in the record to support it. What's your thin air number? What should we be looking at? I honestly don't have one, Your Honor. The point that I was going to make with respect to that number is that I don't think that it answered Judge Newman's question, which is how much money is really going to be paid out. And you'll note from reading Judge Miller's opinion, Judge Miller specifically looks at that issue in terms of whether or not a reverse auction occurred here and whether there was forum shopping to find some convenient plaintiffs. And he points out the deficiencies in terms of the procedure, in terms of the detail that's required by the consumers in that case to actually recover, in terms of coming up with years-old information as to what they were billed for, on what date, by whom, et cetera, et cetera. And, in fact, his conclusion, looking at the substantive deficiencies of the Georgia settlement, as he points out, is that it appeared crafted to limit the recoveries. So I don't think, respectfully, that Mr. Duffy answered Judge Newman's question about how much money is really involved in the Georgia case. I think the $500 million number that he pointed out is not supported by the record. I think it's a number that's pulled out of the air, and it does not in any way, shape, or form reflect what these folks have paid out to the consumers, either directly in response to claims under the settlement or through phone calls that they had received. And you're not going to offer us the downside of the range? In terms of the amount of money that they paid out, Your Honor, they would be in a better position than I would. I don't think it's in the record. Numbers that I've heard have been in the range of $8 million, which would make the $4.3 million roughly 50 percent or more of the amount recovered for two months' work. But that's not in the record either? I'm sorry? That's not in the record either, the $8 million? No, Your Honor, it's not. As I indicated, that's a number that I've heard in talks. I don't know that I can go much further than to say that, Your Honor. Your Honor, I think my time is limited. I have a minute left. I think I'd like to leave the panel with three basic points. One is that these were not parallel proceedings. The federal proceedings were much more fully developed than the proceedings that happened in the Georgia court. It's very important to point out, in terms of the limited nature of this injunction, that Veresign and Jamster, two of the defendants in the MDL, that Judge Miller said were key to the scheme before him with AT&T, were not even defendants in the Georgia case, but nonetheless they're receiving a release in the Georgia case. It's also important to point out that deceptive marketing claims, which were before Judge Miller and formed the heart of the MDL proceeding, are not even contained in the original McFerrin complaint that was filed on April 1st. The second point I would make very quickly, Your Honor, is to echo a statement made by Judge Coffey in the Winkler case, which was very important to Judge Miller and cited by him, namely that principles of federalism and pulmony do not mandate acceptance of forum shopping, much less than the less than forthright conduct that was engaged in by these parties and the obstructionist activity therein. Most importantly, it's important to note, I think, as Judge Graber noted very early on, that this was an effort by Judge Miller to craft a very precise injunction. It is a partial injunction of the claims. He does not seek to stay those proceedings entirely. Perceiving a threat to his jurisdiction, he merely sought to retain jurisdiction over parties like Jamster and Verisign, who are before him, who are part of the illegal marketing activity, and also with respect to the claims that were before him, which were not even contained in the McFerrin court. Those parties and claims don't even show up until May 30th at that telephonic preliminary approval hearing. That's the first point that Judge Bonner even knows that Jamster and Verisign are even part of the case, and she finds out because they're being put in the release, even though they're not defendants. It's also the first time that the claims that encompassed by the MDL litigation are brought to the attention of Judge Bonner in that telephone conference. And I'm sorry I've seen my time's up. Not quite the four minutes, but I see I've gone over. Thank you very much for your time. Further questions? Thank you, counsel. Thank you. The case just argued will be submitted for decision, and the court will adjourn.
judges: Noonan, O'scannlain, Graber